UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

Case No.:_____

JGT, INC.

    Plaintiff

v.

ASHBRITT, INC.

    Defendant
_____/

## COMPLAINT

Plaintiff JGT, Inc. files this complaint against Defendant Ashbritt, Inc. for amounts due under a contract for the removal and disposal of debris left in the aftermath of Hurricane Katrina.

### PARTIES

1. JGT, Inc. ("JGT") is a Mississippi corporation with its principal business in Laurel, Mississippi.

2. Ashbritt, Inc. is a Florida corporation, which maintains its principal place of business in Pompano Beach, Florida.

### JURISDICTION

3. This Court has diversity jurisdiction under 28 U.S.C. § 1332.

### ASHBRITT'S PRIME CONTRACT WITH THE CORPS OF ENGINEERS

4. After Hurricane Katrina devastated south Mississippi, the U.S. Army Corps of Engineers ("Corps") entered into Contract No. W912P8-05-0-0025 (the "0025 Contract") with

1

Ashbritt, Inc. The contract dated on or about September 8, 2005, obligated Ashbritt to collect and dispose of all Katrina debris in the entire state of Mississippi.

5. The "0025 Contract" and applicable Federal regulations required Ashbritt to furnish a payment bond to guarantee full payment to first and second tier subcontractors for all work done. Ashbritt obtained payment bond No. 8192-83-63 from Federal Insurance Company in the penal sum of $100 million.

## ASHBRITT'S SUBCONTRACT WITH JGT

6. Ashbritt subcontracted much of the debris removal work to many companies including JGT at the rate of $9.00 per yard.

7. Ashbritt's contract with the Corps required it to maintain temporary disposal sites ("TDS").

8. Ashbritt set up a total of four TDS sites in Jones County, Mississippi and signed management contracts on an exclusive basis with three separate companies to operate the TDS.

9. Ashbritt asked JGT to manage the fourth site at the airport in Laurel, Jones County, Mississippi. The exclusive contract required JGT to provide *all* labor and equipment in order to operate the TDS.

10. Ashbritt representatives confirmed to JGT's vice president Charles Tigret that JGT would be the only manager for the site. Ashbritt encouraged JGT to hurry up and sign the contract "so nobody else would be in the pit."

11. JGT signed an exclusive management contract with Ashbritt on October 9, 2005.

12. In order to perform the contract, JGT acquired over $1 million in heavy equipment and incurred substantial debt.

13. After the work was underway, Ashbritt breached the contract in several material ways. The written contract stated that Ashbritt would pay JGT $3 a yard for Site Maintenance and Site Processing. Ashbritt arbitrarily cut the rate to $2.50 a yard.

14. Ashbritt verbally contracted to pay JGT 50¢ a yard for Site Remediation, but then failed to pay that amount for all yards for Site Remediation.

## DIVERSION OF WORK

15. In December 2005, Ashbritt asked JGT to increase the volume of grinding. Based on the representations of an exclusive contract, JGT then bought a new grinder for $320,000 in late December 2005.

16. Ashbritt later said that "all good things must come to an end." Ashbritt breached the exclusivity of the contract by allowing other companies to move grinders onto the site and divert substantial work from JGT in February and March, 2006.

17. When JGT protested, Ashbritt said it had to find some replacement work for Coastal and D&J (with whom Ashbritt had a long term business relationship) after Ashbritt lost its contract to remove debris in Jackson County.

18. Ashbritt told JGT not to worry because the other companies would be gone very soon. Ashbritt did not remove them. Ashbritt then ignored JGT's protests.

19. As a result of that breach, Ashbritt diverted revenue of $ 209,545 for 83,818 yards haul-out by others. Ashbritt also diverted revenue of $377,181 for 251,454 yards processed by the other subs.

20. JGT completed all work on the contract by June 30, 2006.

21. Ashbritt breached the contract by failing to pay the agreed rates and by diverting work to other contractors. As a result of those breaches, JGT lost the following net profits:

|  |  |
|---|---|
| Site Processing | $756,125.80 |
| Site Management | $468,180.72 |
| Haul-Off | $211,572.50 |
| Site Remediation | $159,653.85 |
| Diverted Grinding work | $342,234.44 |
| Diverted Haul out work | <u>$155,101.00</u> |
| Total: | $1,881,294.00 |

**RETAINAGE**

22. The subcontract between Ashbritt and JGT, Inc. allowed Ashbritt to retain 10% of all payments. In JGT's case, the retainage is $202,000.

23. Ashbritt's failure to pay the retainage was a material breach of the contract.

24. Ashbritt has not denied that it owes an undisputed amount of retainage in the amount of approximately $202,000. JGT made demand on Ashbritt during the summer of 2010, to pay the undisputed retainage and let the court decide if Ashbritt owes any more. Ashbritt wantonly and willfully refused to pay the undisputed amount in order to exert economic leverage on JGT. Ashbritt had no valid reason to refuse to pay the undisputed retainage.

**VIOLATIONS OF LAW**

25. Ashbritt breached its contract with JGT by failing to pay the undisputed retainage and the contract rates for the various aspects of the job.

26. Ashbritt also breached the contract by diverting work to other subcontractors.

27. Ashritt breached the contract by making payments to JGT from February to June 2006 for less than the contract rate.

28. Ashritt breached the contract by making payments to JGT from February to June 2006 that did not include amounts for the work that had been diverted to other contractors.

29. Asbritt's breaches were continued until the worked was completed in June 2006.

30. Ashbritt's breaches of contract were willful, wanton and malicious and amount to a an independent tort for which JGT can recover punitive damages.

### REQUEST FOR RELIEF

31. JGT, Inc. respectfully requests that this Court enter judgment for:

a. $1,881,294.90 in lost profits.

b. Unpaid retainage of $202,000, subject to an offset for any amounts that Ashbritt paid the IRS pursuant to a levy on amounts owed by JGT.

c. Punitive damages of $1,000,000.

d. Prejudgment interest and legal fees.


Date: February 11, 2011

                                              Respectfully submitted,


                                              /s/ *Lorenz Michel Prüss*
                                              Lorenz Michel Prüss, Esq.
                                               Fla. Bar No.: 581305

                                              DIMOND KAPLAN & ROTHSTEIN, P.A.
                                              Offices at Grand Bay Plaza
                                              2665 S. Bayshore Drive, PH-2B
                                              Coconut Grove, FL  33133
                                              Tel: 305-374-1920
                                              Fax: 305-374-1961

                                              *Attorneys for Plaintiff*